IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NEW YORK

_____

UNITED STATES OF AMERICA

   -v-                                            19-CR-206-A

SHELBY GARIGEN,

                      Defendant.

_____

## GOVERNMENT'S RESPONSE TO THE
## DEFENDANT'S SENTENCING MEMORANDUM

      **THE UNITED STATES OF AMERICA**, by and through its attorney, James P. Kennedy, Jr., United States Attorney for the Western District of New York, and the undersigned Assistant United States Attorney, respectfully files this response in opposition to the defendant's sentencing memorandum.

## PRELIMINARY STATEMENT

      On November 12, 2019, the defendant appeared before this Court and pled guilty to a one count Information charging the defendant with accessing with intent to view child pornography in violation of Title 18, United States Code, Section 2252A(a)(5)(B).  The Presentence Report ("PSR"), consistent with the plea agreement, determined that the defendant, with a total offense level of 21 and criminal history category of I, faces a guideline range of 37 to 46 months imprisonment.  On March 13, 2020, the defendant filed a sentencing memorandum moving this Court for a sentence of probation.  *See* Dkt. #32.  This memorandum is submitted in support of the government's contention that this Court should impose a guideline sentence of imprisonment.

**Statement of Facts**

The government concurs with and relies on the statement of facts outlined in the PSR at paragraphs 11 through 30.

**DISCUSSION**

The United States recognizes that since *United States v. Booker*, 543 U.S. 220 (2005), the sentencing guidelines are advisory rather than statutorily mandated.  However, when imposing a sentence, the Court is required to consider the guidelines, but must fashion a sentence that is consistent with the factors detailed in 18 U.S.C. § 3553(a).  As noted by the Supreme Court, the guidelines have a "real and pervasive effect … on sentencing" and therefore, "are not only the starting point for most federal sentencing proceedings but also the lodestar."  *Molina-Martinez v. United States*, 136 S. Ct. 1338, 1346 (2016).  The United States contends that a sentence of 235 months is reasonable and appropriate in light of the factors set forth in 18 U.S.C. § 3553(a).

Under Section 3553(a), the sentence imposed must reflect the seriousness of the offense, promote respect for the law, provide just punishment, afford adequate deterrence, and protect the public.  *See United States v. Rattoballi*, 452 F.3d 127, 133 (2d Cir. 2006) ("In calibrating our review for reasonableness, we will continue to seek guidance from the considered judgment of the Sentencing Commission as expressed in the Sentencing Guidelines and authorized by Congress …. It bears noting that the Sentencing Commission is an expert agency whose statutory charge mirrors the § 3553(a) factors that the district courts

are required to consider.").  The sentencing court must also consider "the need to avoid unwarranted sentencing disparities among defendants with similar records who have been found guilty of similar conduct."  18 U.S.C. § 3553(a)(6).  A court that imposes a sentence outside the applicable advisory guidelines range must do so on notice to the parties and must state "with specificity" both at sentencing and in the written judgment and commitment order its reasons for doing so.  18 U.S.C. § 3553(c).

### A.    The Nature and Circumstances of the Offense Warrant a Guideline Sentence of Imprisonment

The defendant, utilizing her role as a soccer trainer for an elite soccer travel program, engaged in sexually oriented online communications with two 17-year-old boys, Victim 1 and Victim 2.  To conduct her communications, the defendant utilized Snapchat, a social media application which allows some level of secrecy as the communications ultimately disappear after a short period of time.  Specifically, at the time of the defendant's interview by the FBI on June 14, 2019, the defendant initially stated that "one of the main reasons she used Snapchat to have sexually explicit contact with [Victim 1] and [Victim 2] was because she did not think anyone would ever be able to find the pictures."[1]

The defendant's sexual communications first began with Victim 2 in September or October of 2018, after Victim 2 was injured in a soccer game and needed to see the defendant for treatment.  By about November 2018, Victim 2 and the defendant began sending each other sexually explicit images, and after receiving one image of Victim 2's erect penis, the

---

[1] This quotation comes from the FBI polygraph report of the interview of the defendant dated June 14, 2019.  A copy of this report has already been provided to defense counsel and probation, and can be made available to the Court if necessary.

defendant replied "Wow, you're well endowed."  During her interview with the FBI, the defendant initially claimed that she sent pictures of her naked breasts, naked butt, and a video of her masturbating to Victim 2 to get him to stop asking her for images and to "shut him up," but later admitted that she sent the images and videos "because it turned her on to think about [Victim 2] masturbating to her and made her feel attractive."[2]  Although Victim 2 reported that he never engaged in sexual contact with the defendant, he did report to the FBI that the topic of sex did come up in their chats, but he made it clear to the defendant that he did not want to engage in sex.

The defendant's communications with Victim 1 began in or about November 2018, and quickly turned sexual in nature with them sending each other sexually explicit pictures. Victim 1 reported to the FBI that it was the defendant who asked Victim 1 whether he had a girlfriend and whether he ever wanted to do something with an older woman.[3]  In December 2018, Victim 1's soccer team went to Florida for a soccer tournament, and Victim 1 reported that the defendant also wanted to go with the team so that she could get her own hotel room and have sex with Victim 1 (although the defendant did not eventually go on the trip).  Victim 1 noted that the defendant tried to get Victim 1 to have sex with her on several occasions, with one of the times occurring while they were both at a tournament in Brockport, and as the defendant's son was playing his game, the defendant wanted Victim 1 to meet him at her car and have sex in the car.  During their communications, the defendant sent Victim 1 several

---

[2] This quotation comes from the FBI polygraph report dated June 14, 2019.

[3] This information comes from an FBI report of interview of Victim 1 dated May 29, 2019.  A copy of this report has already been provided to defense counsel and probation, and can be made available to the Court if necessary.

sexually explicit images of herself, to include full naked body pictures, several images of her naked breasts, and two or three images from behind in a mirror.  The defendant also instructed Victim 1 to "get hard" and to send her pictures of his erect penis, which he did.

As the Court is aware, after Victim 1 reported the defendant's sexual grooming to his parents, an undercover law enforcement agent (UCA) continued to have communications with the defendant over Snapchat using Victim 1's account.  It is in those communications where the defendant crystallizes her intent to have sexual contact with Victim 1.  Specifically, on May 30, 2019, a discussion occurred about Victim 1 heading off to college and whether the defendant was going to visit Victim 1.  During the conversation there was joking about the defendant being a "MILF on the loose" and her stating "See how many freshman I can bang…goals" and "Don't worry I will bang U first and then hunt."  On June 6, 2019, while Victim 1 was still a minor, the defendant sent a video 57 seconds in length to Victim 1's Snapchat account of her masturbating with a dark colored sex toy.  In the video, the defendant appears to be lying on a bed in a bedroom and can be heard moaning while she masturbates. On June 7, 2019, the defendant asked Victim 1 to come to her house to be her "pool boy," and during the subsequent conversation that day, the UCA stated that he was not that experienced and the defendant would have to take the lead, to which the defendant stated "Be a good little soldier and do as ur told…easy enough".  During their communications, the defendant believed that Victim 1 would be coming to her house on June 14, 2019.

On June 12, 2019, the defendant sent another video, 26 seconds in length, to Victim 1's Snapchat account of her masturbating on a bed with a dark colored sex toy during which

she can be heard moaning.  In response to being thanked for sending the video, the defendant said "Anatomy class for hump day".  Later that night, while communicating about a hockey game they were both watching, the defendant noted that the St. Louis Blues had just scored a goal, to which the UCA responded "That's us Friday hahahahahahaha" and the defendant responded "Lmao!!! Soooo true!"[4]  During a Snapchat communication on June 13, 2019, the defendant stated "I finally have something to look forward to," and when the UCA asked what she meant by "finally," the defendant responded "I haven't been laid in so long Ive forgotten how amazing it can be".  Finally, on June 14, 2019, the UCA messaged that he was on the way, and asked "Do I need protection", to which the defendant responded "No ur good… Shop is closed can't get pregnant by ant means…which is a bonus for you".  The defendant then agreed to pick up the UCA at a parking lot on Transit Road in Amherst, NY.  Upon arriving at the parking lot, the federal search warrant for the defendant's cell phone was executed and the defendant was interviewed.

Initially, the defendant was interviewed in the parking lot and minimized her involvement in the offense.  Specifically, the defendant stated that it was Victim 1 who had sent her unsolicited pictures of his penis, and that the reason she was planning to meet up with Victim 1 was to "hang out" and not to engage in sex.  Moreover, the defendant denied exchanging sexually explicit images with any other minors.  Following the interview, the defendant agreed to take a polygraph examination and submit to a second interview.  During the subsequent interview, the defendant admitted that she sent sexually explicit images of herself to Victim 1 and Victim 2, and that it turned her on thinking about the boys

---

[4] "Lmao" is an abbreviation meaning "laughing my ass off."  *See* www.grammarly.com/blog/lmao-meaning/, last accessed May 1, 2020.

masturbating to the pictures.  The defendant also acknowledged that the purpose of Victim 1 coming to her house was to engage in sex, and at the conclusion of the interview, wrote out a statement that said in part: "I invited [Victim 1] over to my house today specifically to have sex with him in my bedroom".

As outlined above, the offense to which the defendant pled guilty is a serious offense that involved the sexual grooming of two minor boys, which culminated in a planned meeting with Victim 1 to engage in sexual activity.  It is also troubling to the government that the defendant was able to engage in her criminal conduct based on her role as a soccer trainer for an elite soccer program.  Rather than use that position to legitimately assist the minor boys in recovering from injuries, the defendant appears to have utilized her position to obtain easy access to minor boys so that she could engage in sexually predatory behavior.  As such, based on the nature and circumstances of the offense, the government respectfully submits that a sentence of 37 to 46 months is warranted.

**B.      The History and Characteristics of the Defendant Warrant a Guideline Term of Incarceration**

The history and characteristics of the defendant clearly distinguish this case from most other possession of child pornography cases.  First and foremost, this defendant is an adult female who exploited two minor male victims.  Child pornography offenses involving female offenders are rare.  *See* Bickart, William *et al.*, *A Descriptive Study of Psychosocial Characteristics and Offense Patterns in Females with Online Child Pornography Offenses*, Psychiatry, Psychology, and Law, vol. 26, n. 2, pp. 295-311, January 22, 2019, available at www.ncbi.nlm.nih.gov/pmc/articles/PMC6763121/, last accessed May 1, 2020 (noting that

"[u]ntil recently, sexual offending by women has attracted relatively little attention by researchers in the behavioral sciences. Multiple writers have speculated that this relative lack of interest can be attributed to the fact that women are relatively unlikely to perpetrate sexual abuse when compared to men.").   Another distinguishing factor is that the defendant is a mother of three children, one of whom is a minor male.  Although the defendant's son is younger than the victims involved in this offense, it is troubling to the government that at the same time she was grooming and engaging in sexually explicit communications with two minors, the defendant was also acting as a parental custodian for her minor son.

Based on a review of the investigative materials, the defendant's sentencing memorandum, and the PSR, the government is not convinced that the defendant truly believes the conduct she engaged in was wrong or criminal.  In her sentencing memorandum, the defendant attempts to explain her involvement in the instant offense as a result of her marital issues and emotional health issues.  *See* Dkt. #32, p. 4.  Moreover, during the presentence interview with the Probation Department, the defendant noted that she had a "mental breakdown" in November 2018.  PSR ¶38.  However, in that same interview with the Probation Department, the defendant, for the first time, claimed that she "panicked" after sending a sexually explicit image of herself to Victim 1, and was only engaging in sexually explicit communications with him to "lead him on" so that he would come to her house and she could get him to erase the picture.  PSR ¶39.  This explanation is in stark contrast to her FBI polygraph interview on June 14, 2019, during which she explicitly noted that she was turned on by the thought of 17-year-old boys masturbating to images of her naked body and videos of her masturbating, and that the purpose of Victim 1 coming to her house was for the

sole purpose of having sex.  Not once during the defendant's prior interviews with the FBI did she indicate that her sexually charged communications with Victim 1 were simply a ruse so that she could get him to delete the graphic images and videos she sent him.

Similarly, with respect to Victim 2, the defendant now claims that upon receiving a "dick pic" from Victim 2, she did not open it and told Victim 2 that this was illegal.  PSR ¶40. This is directly contradictory to the admissions she told the FBI, namely, that upon receiving an image of Victim 2's erect penis, she told him "Wow, you're well endowed," which would indicate that she viewed the image.  Absent from the FBI reports, or her written statement, is any indication that the defendant attempted to dissuade Victim 2 from sending sexually explicit images.  Rather, the defendant willingly engaged in sexual banter with a 17-year-old minor boy because it was amusing to her and made her feel more attractive.  Specifically, the FBI polygraph report noted that "[e]ventually, [Victim 2] told her that the eggplant emoji meant 'penis'.  [Victim 2] sent her an eggplant emoji and a peach emoji, and Garigen asked if that meant [Victim 2] wanted to have anal sex with her.  [Victim 2] said yes.  Garigen thought this was very funny."

An individual who was friends with the defendant on Instagram, a social media platform, also shared with law enforcement a posting the defendant made in January 2020, when she turned 42-years-old.  Attached hereto as **Exhibit 1** is the posting made by the defendant, which states "41 was by far the worst year of my life but I will not let 42 be defined by lies, false accusations, and fake news."  However, based on a comparison of the information the defendant told the FBI on June 14, 2019, to the explanations the defendant

provided to the Probation Officer, it appears to the government that the defendant is the one who is providing false information to the Court in an attempt to gain leniency at the time of sentencing. This is concerning to the government, as it indicates that the defendant is trying to re-write the narrative of her offending behavior and has failed to fully acknowledge the severity of her crime, and as such, has yet to come to terms with her sexual interest in 17-year-old boys. Therefore, the characteristics of the defendant, as applied to this case, weigh in favor of a term of incarceration within the advisory guideline range.

### C.     The Defendant's Conduct Has Negatively Impacted the Victims

In a child pornography case such as this one, the primary victims are the children depicted in the images possessed and received by the defendant. *United States v. Shutic*, 274 F.3d 1123, 1126 (7th Cir. 2001); *United States v. Sherman*, 268 F.3d 539, 547-48 (7th Cir, 2001). As the *Sherman* Court noted, "child pornography directly victimizes the children portrayed by violating their right to privacy." *Id.* As the Court noted in *Shutic*, "children ... suffer profound emotional repercussions from a fear of exposure, and the tension of keeping the abuse a secret." *Shutic*, 274 F.3d at 1126. (citations omitted). Therefore, a sentence for the defendant's conduct must account for the impact her conduct had on the victims depicted in the images she obtained from the victims. On February 27, 2013, the United States Sentencing Commission issued a Federal Child Pornography Offenses Report ("Report"), which reaffirmed that all child pornography offenses perpetuates the harm to the victims depicted in the images and fuels a market for the production of such images. *See* Report, ch. 12, p. 311-12 (available at http://www.ussc.gov/news/congressional-testimony-and-

reports/sex-offense-topics/report-congress-federal-child-pornography-offenses, last accessed May 4, 2020).

The defendant's actions directly harmed the lives of at least 2 known victims. In particular, Victim 1's impact statement which was filed under seal with the Court, noted that as a result of the defendant's conduct, he lost a friend, distanced himself from his family, and affirmatively requested a sentence of imprisonment. Moreover, the parents for Victim 1 have indicated they will attend sentencing and provide an oral impact statement to the Court. Therefore, the impact of the defendant's conduct on the victims clearly weighs in favor of a custodial sentence for the purposes of just punishment and promoting deterrence.

## CONCLUSION

For the foregoing reasons, the defendant should be sentenced to a guideline sentence of 37-46 months imprisonment.

DATED:  Buffalo, New York, May 4, 2020.

JAMES P. KENNEDY, JR.
United States Attorney

*S/ AARON J. MANGO*

BY:    _____

AARON J. MANGO
Assistant U.S. Attorney
United States Attorney's Office
Western District of New York
138 Delaware Avenue
Buffalo, New York 14202
(716) 843-5882
aaron.mango@usdoj.gov