UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

---

UNITED STATES OF AMERICA

vs.

SHELBY GARIGEN,
              Defendant.

**NOTICE OF MOTION
AND MOTION
19-CR-00206**

---

**P L E A S E   T A K E   N O T I C E**, that the undersigned, THOMAS J. EOANNOU, attorney for the Defendant, SHELBY GARIGEN, upon all the papers and proceedings heretofore had herein, hereby moves for an ORDER TO DELAY THE DEFENDANT'S VOLUNTARY SURRENDER DATE TO FDC Philadelphia, Pennsylvania, presently scheduled for February 2, 2021 and for such further relief as the Court deems just and proper.

## **AFFIRMATION**

**THOMAS J. EOANNOU, ESQ**., an attorney at law, pursuant to 28 U.S.C. §1746(2), declares the following under penalty of perjury:

1. I am an attorney at law, duly licensed to practice in the Western District of New York and my firm is being retained to represent the Defendant-Appellant (Appellant), SHELBY GARIGEN.

2. I am familiar with the facts and circumstances of this case and make this declaration in support of a motion to delay the voluntary surrender date of appellant for a period of thirty days.

3. The facts set forth in this declaration are based upon conversations with trial counsel and appellant and my office, and a review of the available papers and pleadings in this matter, including the stenographic transcript of the plea and sentencing proceedings.

4. On the 22nd day of December, 2020, appellant was sentenced by this Court to an aggregate term of incarceration of thirty-seven months.

5. This Court granted appellant voluntary surrender and, thereafter, appellant was mailed a letter directing her to

surrender to FDC Philadelphia, in the State of Pennsylvania, to commence service of this sentence.

6. Appellant has always attended Court as directed and has steadfastly complied with the conditions of her pre-trial release.

7. A notice of appeal from judgment was timely filed by appellant's counsel, James C. DeMarco, III, Esq. My office will thereafter file a notice of appearance and intends on perfecting the appeal.

8. It is my intention to move for bail pending appeal pursuant to Section 3143(b) of Title 18, United States Code. However, in order to ascertain the merits of the appeal, I will be required to fully review the record on appeal. I anticipate that this will be complete in the next two to three weeks.

9. Said appeal is not for the purpose of delay and will seek to raise questions of law likely to result in a reduced sentence to a term of imprisonment less than the total time expected for the duration of the appeals process.

10. While it is impossible to advise this Court of the precise nature of the issues to be raised on appeal without a thorough review of the record, it is anticipated that the following issues will be raised on appeal from judgment:

11. The parents of "Victim Number 1" impermissibly spoke at sentencing. 18 U.S.C. 3771 provides in pertinent part:

> "In the case of a crime victim *who is under 18 years of age*...the legal guardians of the crime victim or...may assume the crime victim's rights under this chapter..."

12. Here, the victim was 19 years old at the time of sentencing. He did not speak at sentencing, and his parents, both experienced practicing attorneys, spoke in his stead, and claimed to speak on his behalf. This issue seems to be a case of first impression insofar as Victim 1's 18th birthday occurred *prior to* appellant's arrest on the day appellant and "Victim Number 1" had scheduled a meeting to allegedly engage in sexual intercourse.

13. The undersigned intends to argue to the United States Court of Appeals for the Second Circuit that this constituted a due process violation, particularly where "Victim Number 1"

expressed to the U.S. Probation Officer, "he did not have a statement regarding sentencing for the defendant, due to now knowing the legal system."

14. Victim 1's parents' testimony was inherently prejudicial and should not have been received. Victim 1's mother, an attorney who is employed by the Erie County District Attorney's Office, admitted, "I'm hardly objective."

15. She told the court Victim 1 was "angry a lot"; was withdrawn; and recently ended a friendship with one of his best friends, Victim 2. She claimed this was a direct result of appellant's conduct. See <u>Sentencing Proceeding</u>, December 22, 2020.

16. She took particular issue with her perception that appellant sought to "engage in inappropriate relationships with" minors. However, NYS Penal Law provides that the age of 17 is the age of consent. Thus, a sexual relationship between appellant and either of the victims would not have run afoul of any law and should not have been a factor in determining sentence.

17. Victim 1's mother characterized appellant's query to Victim 1 regarding his sexual interest in older women as "grooming." It is not. In the real world, it is perfectly legal.
18. She referenced her son's "refusal to talk about this with anyone" and the fact that he lost one of his best friends, fearing "this incident will have a lifelong relationship on him…" She fails to note the real possibility that her 17-year-old son may have withdrawn from friends and family because the FBI became involved by interviewing both him *and* his friend, Victim 2. Notably, Victim 2 declined to provide a Victim Impact Statement and requested no further law enforcement contact. PSI Report at paragraph 31.
19. She explicitly referred to appellant "a sexual predator."
20. The father of Victim 1, a former prosecutor who previously prosecuted sex offenders, noted that he appeared before this Court previously. He made many comments about his credentials and experience, including defending "murderers" and the fact he had conducted "75, 85 jury trials."

21. The father advised the court that he "helped the U.S. Attorney's Office prosecute this case." It goes without saying that a victim or victim representative does not have final say in discretionary prosecutorial matters or "veto" power over prosecutorial decisions. The father's words, however, implied otherwise. Indeed, those words suggested the father had read a copy of the Presentence Report.

22. The father also made note of the impact on his son sending two pictures of his penis to appellant had on him; "he is ill-equipped to deal with this life sentence that Ms. Garigen has handed him." He highlights the fact that his son "shuts down" and refuses to talk to him about the incident, noting his son's response: "Dad, I am not a snowflake."

23. Like the mother, the father is insistent that his son's attitude is due to the trauma he suffered as a result of himself sending two pictures of his penis to appellant—indeed, that was the only illegal conduct that occurred here. The father told his son, "You are a victim," and failed to consider that his son, who was 18 when appellant was

arrested (when the undercover agent was ostensibly arranging a meeting between Victim 1 and appellant for what would have been a perfectly legal physical encounter between the two), was disturbed or embarrassed that his parents involved the FBI. Again, notably, the defendant did not speak at sentencing.

24. The father claimed "the parents of the—of Victim Number 2 are not here because they could not bear to be here to face her. They didn't know what they would do." This claim seems contradicted by the PSI Report and appellant had no way to test the veracity of it.

25. Both parents biggest issue seemed to be the fact appellant allegedly sought to engage in sexual relations with their son, despite the fact a sexual relationship would have been perfectly legal.

26. The theme of the father's statement to the court was that appellant "duped everybody", but he revealed to the Court his own bias against appellant when he acknowledged he unsuccessfully sought to have appellant removed from her

| | |
|---|---|
| 1 | position as an athletic trainer at Empire Soccer "for years" |
| 2 | because she was "not licensed in this state" and is |
| 3 | "practicing illegally and she has practiced illegally."  He |
| 4 | went so far as to express to the court that he believed |
| 5 | appellant "targeted" his son as some form of retaliation for |
| 6 | his unsuccessful efforts to have her terminated from her |
| 7 | employment.  He claims she got "paid by Empire Sports to be |
| 8 | a pedophile"—again, ignoring the fact that sexual relations |
| 9 | with a 17-or-18-year-old is perfectly legal.  And again, he |
| 10 | reinforced his theme that she "duped Empire into hiring her |
| 11 | to put her in a position to exploit and sexually abuse young |
| 12 | boys.  That's the type of woman she is." |

27. The father's theme continued when he offered his apparent expert opinion on appellant's psychiatric diagnosis.  He claimed that she "duped" both the psychiatric nurse practitioner and the social worker who assessed her because the diagnosed her with "wildly disparate psychiatric disorders", to wit: Major depressive disorders and histrionic personality disorders.  He told the Court, "They're not even

on the same axis, Judge, in the DSM-5. One is a personality cluster B disorder, and the other is Axis 1. Again, she has duped everybody." First, Victim 1's father is not a psychiatrist. Two, the undersigned knows of no valid medical opinion that a sick patient cannot suffer from more than one mental health disorder, irrespective of what "axis" each may fall under.

28. The father characterized appellants actions as "some of the most reprehensible crimes and actions that one can engage in" and said to the Court, "I know you've read the PSR, Judge," implying that he had himself read the PSR (referring to the Presentence Investigation Report). The PSI Report is a sealed document that is provided to the Court, counsel for the defendant, and counsel for the government.

29. In an attempt convince the court that justice must be "gender-blind", the father made an absurd comparison between appellant's apparent pursuit of Victim 1 and "a male gynecologist" who had "offered up sex to 17-year-old patients, female patients, we wouldn't be having this

discussion." This argument directly followed his assertion that we are a "government and a society of laws" and "[s]he had broken that law." Again, aside from doctor-patient ethical rules—if they even apply to that comparison—17-year-old males and females can consensually engage in sexual relations with companions who happen to be older than them without legal consequence to either.

30. Finally, the father insinuated that he had final say over potential plea offers: "I did not want to consent to this plea"; "four phone calls it took to convince me and my specific request each time we had this conversation, *and I had [Victim 1]'s full backing*, was very specific. I want her to do jail time." He indicated he relented "after the fourth conversation, I said, okay. I'll consent." But, he said, had he read about inconsistent accounts of appellant regarding whether or not she intended to engage in *legal* consensual sexual relations with Victim 1, set forth in the defense sentencing memorandum and the government's reply memorandum, "there's no way, Judge. I would have asked

for a production of pornography which carries a minimum of fifteen years." There is no proof, evidence, or allegation the defendant "produced" illegal pornography.

31. The government also improperly urged the court to consider appellant's actions in seeking sexual relations with Victim 1. The government prosecutor told the court: "The defendant attempted to lure Victim 1, or who she thought was Victim 1 but was, in fact, an undercover FBI agent, into coming to her house to have sex with her." Again, the government suggested appellant "lured" Victim 1 to come to her house to engage in a legal sex act. Indeed, at the time the meeting was scheduled to come to fruition, Victim 1 was 18—and thus had been a consenting adult for over one year—so *anything* of a sexual nature that could or would have occurred behind closed doors was legal.

32. The government, like the parents, focused primarily on their belief that appellant sought to have sexual intercourse with Victim 1, when in fact sexual intercourse would have been entirely legal.

33. In addition to the improprieties set forth above, it is likewise respectfully submitted that issues relative to the imposition of a non-guideline sentence were overlooked and not presented to this Court.

34. For example, in promulgating the Sentencing Guidelines, the United States Sentencing Commission (USSC) Guidelines failed to consider the anomaly that occurs when two parties are of the age of consent required to engage in sexual intercourse, yet one of the parties is a minor for purposes of the child pornography statute. While society has a strong interest in preventing dissemination and distribution of images or video of such an encounter when one of the parties was a minor, such was not an issue here. Sending a self-picture of an "unidentified" penis (i.e., Victim 1's face was not in the picture) to a self-deleting application would not in any way "create a market" for child pornography and contribute to the victimization of minors.

35. Likewise, a second anomaly in the Sentencing Guidelines that likely were not considered or anticipated by the

Sentencing Commission is that fact Victim 1 took a "selfie" of his erect penis, and nothing more, and sent it via the Snapchat application where, by design, it would be viewed and disappear forever. Even Snapchat acknowledges that the images are not captured or stored on its server. Thus, appellant was subject to the same sentence for a one-time viewing of several "selfies" depicting only a penis, as another offender would be subject to for viewing images of two prepubescent minors engaging in sex acts—images that may have been distributed to thousands of pedophiles.

36. It is respectfully submitted that these two anomalies alone warranted the imposition of a non-guideline sentence of probation.

37. In addition to the anticipated stay pending appeal, there are other circumstances that warrant a delay in Appellant's surrender date. The Covid-19 pandemic is setting records for disease transmission. However, vaccines are being manufactured and distributed at record speeds and it seems there is an end in sight. Sending appellant to prison at the

height of the pandemic is unjust when she has potentially meritorious issues that could ultimately result in a resentencing proceeding.

38. The undersigned intends to move for appellant's release pending appeal in an expeditious manner and anticipates filing such motion within thirty days of the instant motion.

39. Upon our review of the record on appeal, should additional issues become apparent, the undersigned will provide a more concise statement outlining the issues to be raised on appeal in support of the motion for release pending appeal.

40. It is likewise important that our office has the opportunity to meet and communicate regularly with appellant so that we can discuss her appeal strategy.

41. It is respectfully submitted that the government will suffer no prejudice via the granting of the relief requested herein.

**WHEREFORE**, it is respectfully requested that the Court grant an Order delaying the voluntary surrender date of the defendant for a period of thirty days in addition to such other relief as this Court may find just and equitable.

**DATED:** Buffalo, New York, January 21, 2021.

Respectfully Submitted,

/s/ THOMAS J. EOANNOU

---

THOMAS J. EOANNOU, ESQ.
Cornell Mansion
484 Delaware Avenue
Buffalo, New York 14202
(716)885-2889 (T)
(716)883-2163 (F)
lawoffice484@yahoo.com

TO: Aaron J. Mango, Esq.
U.S. Attorney's Office
Federal Centre
138 Delaware Avenue
Buffalo, NY 14202
Email: aaron.mango@usdoj.gov

Lisa B. Ferraro, USPO